And we'll next hear arguments in United States v. Reyes-Garcia, Serrano-Carreno, and Contreras-Ibarra. So I understand that defendants' counsel is dividing time. Please stick with your time because we have a long argument on this case. Thank you. Very good, Your Honor. I've got eight minutes and I'm going to try to reserve two minutes of that for rebuttal and I'll try to keep track of my time. All right. Your Honor, there's obviously multiple evidentiary and issues I've raised in the brief. I think, though, what I'll start with is how all those errors add up cumulatively to prejudicial error, unless the Court wants to direct me to some other issue. I think you have to first consider what was missing from the government's case here. The evidence that exists in most drug cases didn't exist here. You didn't have an undercover with respect to Mr. Reyes. You didn't have an undercover drug transaction with someone getting drugs from him. You don't have finding drugs in his car or his house. You don't have wiretaps where he's talking about drugs. The only direct evidence the government has was a co-defendant who is subject to all the sorts of impeachment a cooperating co-defendant is subject to. The other evidence all had some ambiguity. You have these telephone contacts and toll records with nothing known about what was said. You have these meetings with nothing known about what is said. And that left open the following defense argument, which was, at the very least, a viable one. A co-defendant who's cooperating isn't trustworthy. The other evidence of associations and contact isn't enough because, first, it's part of a broader, more general association because evidence showed contacts on other days, too. Second, we don't convict in this country upon guilt by association. That's the argument you make to the jury. Third, critical evidence of what was done or said in these telephone contacts and meetings is missing. The inadmissible evidence and impermissible argument filled the holes in the government's case or undercut the defense argument in at least three key ways. First, the hearsay testimony about other information the case agent had and what the other two co-conspirators said filled the hole of all they got to cooperating co-defendant. First, the co-conspirator statements added statements made by co-conspirators when they had no motive to lie. Second, you had a well-established confidential informant working for just money rather than a cooperating co-defendant. Third, you had this FBI agent saying, oh, well, we had other information about there about Mr. Reyes being involved with Mr. Marquez and drug trafficking. Second, there's other inadmissible evidence that paints Mr. Reyes as acting like a drug dealer. He engaged in counter-surveillance like drug dealers do. That's one of the inadmissible pieces of evidence. Well, isn't most of what the agents testified about what they saw... On the counter-surveillance? Yes. Isn't it virtually all what they were seeing as opposed to a response that, yes, this is consistent with counter-surveillance and there was never any objection to that? Well, it's true there's no objection, but you have cases, Vera and I believe it's Turalba, that find plein air in some dual-role testimony. I think the problem, Your Honor, with a dual-role testimony here is it's a good example. Yeah, the agents testified about what they saw, but there's always the argument that people think they see something that's not quite what they see. But now we've labeled these agents as experts in counter-surveillance, and the danger is that... Well, they weren't actually labeled experts in counter-surveillance. They said he was driving crazy. It was what I would call counter-surveillance. They called... So they have the one word to describe his driving. It didn't seem to me that they were called on to give any expert testimony at all. I think there's three ways that made it seem like expert testimony, Your Honor. The term counter-surveillance, then you talked about the techniques that drug dealers used, and then in one instance, the question from the prosecutor was, based on your training experience, did you recognize? To go back to your judgment, I think the danger here is the jury's going to think because they're experts who know about, quote, counter-surveillance, unquote, they're probably better and more expert in seeing what people are doing. And so what they say they saw in terms of driving up cul-de-sacs or the various things they said they saw, that gets more credence because they're experts at this stuff. So that's, I think, the danger here. And that is one of the dangers that the dual-role testimony cases talk about. The third thing that the drug dealers are like type evidence that came in, of course, is he threatened people like drug dealers do. That came in through the co-conspirator statements. Then drug dealers get painted as extra scary in the prosecutor's closing argument. Oh, I'm sorry. No, no. On the co-conspirator statements, there were some hearsay objections. Was there any specific objection that these are hearsay because they weren't in furtherance of the conspiracy? Did anyone make that specific objection, which is what you're arguing on appeal? No, but I think a hearsay, I think objecting is hearsay. You don't have to say it's hearsay because it's not in furtherance. I think objecting is hearsay is a sufficient objection. You don't have to analyze every prong of all the possible hearsay exceptions, I think, unless and until the other side comes up and says, well, it's this exception or something like that. No, Your Honor, it was the continuing objection on hearsay grounds, but I think that's sufficient. Of course, you have the argument about toxic drugs being poured into the community. Counsel, I want to ask you about that. Please do. I'm looking at a transcript where you have Mr. Ibarra's attorney questioning Agent Jewell and saying, I want to ask you a few questions about methamphetamine and regarding why it is so dangerous. And the agent says, well, number one, every ingredient in methamphetamine is toxic to the human body. So this came out in evidence through questions by defense counsel. So how is a comment on that by the prosecutor either prejudicial or not harmless? I think it's the combination of the three things, quote, toxic, unquote, drugs, quote, pouring into, unquote, quote, the community, unquote. I think it's very similar to the Fleming case that I cited in my reply brief, where there was poison coming into Denver from some other city or something like that. And the court had said that potentially could be prosecutorial misconduct. But that case didn't have a defense counsel asking a question which elicited an answer that methamphetamine is toxic and no one moved to strike it, right? Correct. But I think that wasn't in the context of the agent saying we have toxic drugs pouring into the community in the context of arguing the defendant should be convicted. I think it's different when you have that in closing argument being highlighted in that way with that chain. You also, of course, have the closing argument, the last error here that I think was very damaging to the defense. The whole point of the argument that was available to the defense here, it depended on defense attorney persuasion. This wasn't a case where there was a bunch of defense evidence that put the government evidence in doubt. It was an argument about persuading the jury that this wasn't enough. And when you then impugn defense counsel who's trying to be that persuader, that's especially damaging. I see I'm down to 30 seconds. Unless the court has other questions, I'll reserve that. Good morning, Your Honors. Jason Saunders for Angel Carina. I'd like to reserve one minute. I raised two issues in my brief and incorporated others by reference. I'd like to focus on the failure to conduct a jury inquiry after a safety concern was raised. This court decided in United States v. Simbob that whenever a colorable issue of safety arises, the court must conduct a jury inquiry. Is it a colorable issue of safety that arises or is it jury tampering and contact? It can be any one of those three. I think what happens in Simbob is it's a threatening, menacing look of an eyeballing from the defendant to a juror. I think also in our cases that we have, both Blitch and the present case, we have these juror questionnaires that raise concerns that, wait, this information is being given out and do the defendants know about that and especially do the defendant's family in a Washington statewide large drug operation know where I live, know where I work, and can find me and hurt me. Counsel, even if we agreed with you that the case you've cited is applicable here, did that case involve a circumstance where the juror was actually excused and didn't participate in deliberations? It did not, Your Honor. Do you have any case that stands for the proposition that the failure to conduct this inquiry is error in a circumstance where the note was from one juror who was later excused? Simbob. Sintob. Yes. Sintob. In that case, the juror was not excused. Not excused, but it was talking about there was a fear of one juror, but that the judge had an opportunity and an obligation to ensure that the other jurors hadn't been communicated with the same safety concern. It all stems back to the violation of a constitutional right to a full panel of jurors that are impartial. And so because this happened the day after, they were talking about how elaborate and sophisticated this drug operation was, how confidential sources, the names can't be given out because of the danger to them. This juror comes in the very next day and says, what about my name? What about my occupation? Where is my home address? Does the defendant know this? And so yes, at that point, Simbob says you must conduct the jury inquiry, but not only to find out if her safety concerns are alleviated, but also to determine if she could be impartial and whether other jurors shared that information. This jury instruction or this jury answer was given to the panel of the jury. So they saw this question and answer and those same concerns could rise. What's interesting to me is the answer itself. Here's a question of, do they know my name, occupation, where I live? And all it addresses is no, they don't know where you live, but your name, yes, they do know that. Your occupation, yes, they do know that. And there's these three people in the jury room that this juror was concerned about and may have communicated to others before she was dismissed. So I think that raises, and I think the Blitch case is almost a mirror example of the problem we have with jury questionnaires. It can raise a question of concern of safety and the answer of modification of, you don't have anything to worry about, as the Blitch court says, that just never happens. Or the answer in this case, oh, the attorneys have this information very briefly, but they don't know your home and work address. Well, if they know that your name is Molly Ringwald and they know what studio you work in, that's not so hard to find that person. You're easily done on Google or private investigator or anything. So those are real concerns. And- So as a matter, in your view, as a matter of law, the judge's view that given what was in this note, further questions could exacerbate the problem and highlight it for the jury that that's just wrong as a matter of law and the judge had no discretion when asked the next day to conduct an inquiry to say no. That's true. Yes. Yes, Your Honor. And also because it answers a question of the safety concern, but it doesn't answer at all the question of continuing impartiality and non-bias. So once it's raised, it's up for the government to rebut the presumption of prejudice. And without a record of prejudice, there's nothing left except for reversal to find out, remand to the trial court to find out if this was communicated to other jurors and if they remained impartial, just like the remedy in Simtaba. And as the court has any questions, I'll reserve the rest of my time for rebuttal. Thank you. Good morning, Your Honors, and may it please the court. Harry Williams for Appellant Hector Contreras Ibarra. I'd like to focus on the confrontation clause violation and the limiting instruction. This is not a case where the court needs a broad rule. The narrow ruling required here is just that where the government has proposed a witness and fought very hard to have that witness included in the trial, and where the government refers to that witness's testimony in its opening, and where a co-defendant elicits testimony from an agent that's hearsay testimony, and then the person doesn't testify. The remedy has to be much stronger than a limiting instruction that simply repeats all the bad testimony that—all the bad, unconfronted hearsay testimony that was brought into the trial. Let me first address the government's contention that there was no confrontation clause violation. The government argues that CS3 could have been called, but there's no case that says that where the government has proposed a witness and referred to that testimony in opening, and that witness has been cross-examined by a co-defendant, that your force, that that situation forces the defendant to call perhaps the most powerful, I think in this case the most powerful witness against him or her. There's no case law to suggest that you're invoking your confrontation clause, right, is dependent on your making this decision to call the witness that the government has chosen not to. That is my—yes. And the government doesn't cite any such cases. They instead, I think, rely on the forfeiture by wrongdoing sort of line of cases, and that's, I don't think, applicable here. There was no showing in the district court that my client did anything wrong, so I don't think you could argue that, you know, it was forfeiture by wrongdoing. So you rely on Bruton to say that a limiting instruction is not enough, but the government says that Bruton is quite different because there—it was a co-defendant who was incriminating himself and the defendant, and it wouldn't be possible for the jury to ignore that. So why is Bruton applicable here, or is there another case that supports your position that a limiting instruction is not enough? I think that Bruton and—I'm now blanking, but it will hopefully come back to me. There's another Ninth Circuit case that we—that I cite a lot in the brief. And the reason it applies here is—so this person, this CS3, he testifies that he dealt drugs with my client. So he is, you know, an unindicted co-conspirator if the government's theory is that the—is that this conspiracy spanned to eastern Washington and included this guy. I mean, he testifies that he traveled with my client with pounds of methamphetamine. I mean, that's a, you know, a co-defendant testifying. I don't think that that's—that Bruton makes a big distinction between, you know, that situation and what we have here. Well, I think Bruton does talk about powerfully incriminating evidence from basically a co-defendant, right? Right. And so, you know, I think that that is applicable here because of who CS3 was. CS3 wasn't some random person. He testifies that, you know, he worked with my client, specifically my client. And you know, the limited instruction is particularly problematic because we have a bunch of testimony from the—these are, I think, state officers who did this initial deal and—or were around it at least. They didn't observe it. So they don't have any first-hand knowledge. And so what the district court has to do with the limited instruction, instead of—I think we would have a tough argument about the limited instruction. Let me take a step back. If the district court had done what defense counsel suggested, which is just— Which is strike the entire testimony of the officers. Exactly. But how is that related to the violation? I mean, how is—why would striking the entire testimony, including testimony that had nothing to do with CS3, why would that help remedy the Confrontation Clause problem? Well, I think it wouldn't, in retrospect, be the—what I would have suggested that she do. But at least there, it's just out of your mind. Whereas what happens with the jury is that the jury is forced to hear the judge, the most important person in the courtroom, say, well, you know, you are to disregard that, you know, Mr. Contreras-Ibarra sold drugs on December 4th, 2015, that he did it at this house, that he did it with this person. They're hearing again and again and again. And then because it wasn't all struck, because the defendant—the detective's testimony wasn't all struck, the government was able to say, well, remember that drug deal in December 2015 at closing. So they thought it was substantive evidence. They thought it was necessary for conviction. The government, yes. But I mean, wasn't what they actually talked about in closing argument was the specific testimony from—I might have the names wrong—Rojas and Fairchild? Yes, but this is why I think they— They testified, right? Yes. No, but they were detectives. So Rojas was the detective. And so when they said, oh, you know, remember this deal, I mean, the basis of that deal was this unconfronted hearsay testimony that CS3 had. And so when they said, remember the December 2015 deal, the January deals are different. The January deals didn't involve my client. But they specifically, in closing, said, you know, remember the December 2015 deal. That is the unconfronted hearsay testimony deal. Okay. You're over your time. Thank you. Good morning, Your Honors, and may it please the Court. I'm Teal Miller on behalf of the United States. I'm going to take the issues in the reverse order. So I'll start with the Confrontation Clause issue. The key—two key points with regard to that issue. The first is that there was a limiting instruction here, and it was a broad one. The Court told the jury to disregard and give no weight to certain limited portions of the testimony. And then it started. Specifically, the Court instructs you to disregard Detective Rogers and Agent Rojas' testimony regarding what CS3 told them during the course of their investigation. But, Counsel, you know, the government gets to decide how it's going to put—what order it's going to put its witnesses on. So couldn't this whole problem have been avoided by the government deciding whether or not it was going to put on CS3 first before actually bringing out the testimonial hearsay and then making a decision, no, for whatever reasons, we're not going to put the confidential informant on? I mean, wouldn't we have avoided any problem at all by just the government changing the witness order? No, I think so, because there's also a strategic decision that comes in on Defense Counsel's part, which is they cross-examine these witnesses about CS3's statements. But, I mean, they reasonably assumed that CS3 was going to testify, because otherwise there would have been no basis for the agents allowing this testimonial hearsay. Respectfully, I disagree. The only thing brought out on direct with regard to CS3's statements was Agent Rojas was asked, why did you look at the license plate number? Why did you look up who owned the car with this license plate number? And he responded, because CS3 told me that that car was associated with the people who he dealt drugs with. But this was going to be their only chance to do this cross-examination, right? That's not right either. As Counsel for one of them actually conceded when there was an argument about the Confrontation Clause issue, he could have recalled these agents to make his defense case. And he says, I made a strategic blunder in cross-examining. He says, wow, this is my fault. I shouldn't have cross-examined these witnesses. I should have recalled them. And, of course, that's right. They're stuck with the- Well, I mean, but it's not right. I mean, they had no reason to believe when the agent was testifying that the confidential informant was not going to testify, right? Well, I think the Bond case stands for the proposition that just because a witness is on a witness list doesn't mean that that witness is going to be called to trial. And it's incorrect to suggest that we told the jury we were going to call this witness. What we said is, you're going to hear evidence about this deal, this December 2015 deal that took place at the Yakima House. We did not say we were going to call that witness an opening. So he was on our witness list. We did expect to call him. The only thing the record reflects is that we didn't because he received a threat. And we made the decision that, at that point, it wasn't worth it, the risk to his safety, to call him. But that doesn't mean we, in some sense, entrapped the defense. The defense made a strategic decision that turned out to have been a blunder. They could have dealt with this in their defense case. I also think it's wrong to suggest that the second key point about this evidence is, and I think some of the back and forth about it, gets to this. Evidence that this transaction happened, that it was a controlled transaction, that they spoke with CS3 before and after, and sort of they patted him down, all of that still comes in. So there's still a transaction involving the Yakima House that comes in. The only thing that came out on direct, again, is the statement that, why did you look at the license plate? Because they told me that was, that car, the blue Mercedes, belonged to the people who were my drug dealers. Unless the Court has further questions about this issue, I'll turn to the jury note. Judge Dorsey asked, I think, the key question or the key distinction here, which is, is Simtob and the Seventh Circuit's decision in Bletch and Rimmel, the Supreme Court decision on which they're based, are they about any kind of suggestion of bias, or are they about a specific subcategory, which is jury tampering or contact with the jury? And Simtob says, it's really about a rule, a presumption that you have to inquire of the jury when there's improper contact with a juror or any form of juror tampering. And then it elaborates. It says, that includes indirect, coercive context that could affect the peace of mind of the jury. Here we have no evidence of any contact that's specific to the jury. Even if you accept the defense's view of what happened in the district court's inference that there were three witnesses who caused people to wonder. That's what the district court said. The district court said is that the district court believed this was why the juror sent the note, right? That's right. And the district court was, I mean, and we've suggested that the note doesn't actually say that. But even if you accept that that's the inference, that that was a correct inference, the district court was also in the best position to exercise its discretion and figure out how worrisome were these three individuals? How afraid does the jury seem? The fact that the jury, or that the district court exercised that discretion correctly, I think is played out in the fact that there was no follow-up to this jury note. No further suggestion of concern on the part of the jury. And that is a big contrast with bleach, where you have the first veneer is eventually the the court security officer tells the court all of the jurors are talking about the fact that they're afraid about their jury information, and then they impanel another veneer, and it happens again. Here we have one juror asked a question, and as Judge Bennett noted in his question, that juror ultimately doesn't sit on the case. And for those reasons, I think we're really in the area of discretion, and this is more like cases where a district court has discretion to try and make an assessment based on what is available to it. And given that the judge is the judge who drew the inference about bias, he was also in a position to decide the best way to handle it. Your position, there's no evidence of contact or even indirect coercion? With the jury. Yes. Yes. And that that's necessary to put you in the sort of subcategory of cases controlled by SEMTOP. To get you in the REMER rule. Yes. Yes. And just a final note on this issue. As counsel notes, the appropriate remedy would be sending it back to the district court for calling all the jurors in and asking them. Again, we don't think that that remedy is appropriate here, but it doesn't result in a sort of outright reversal of the conviction and case is over. Counsel, I'd like to, I want to make sure you can do it in whatever order you want, but I want to hear your response to the argument about the testimony about all of this information that the FBI received from other sources about these defendants, which you've argued in your brief, somehow, in your view, isn't hearsay. So as I understand it, there's only one piece of testimony and that's Agent Weathers testimony. And this is at the excerpts of record at page 46 through 47, unless I'm misunderstanding your question. He's asked, at some point, did you start working with the DEA Bellingham in this case? He says, yes. They say, why? We received information that Baltazar Reyes Garcia was working with Eric Marquez and other individuals in the Marquez family. I think that was the statement that you've said was objected to, but I think the defense raises three other pieces of information that arguably are viewed under the plain error standard. But the one you first identified is the one that they clearly objected to. That's right. They clearly objected to that. And you've argued that isn't hearsay? I've argued that that is permissible for explaining the development of the investigation. I also, I think it is clearly not prejudicial because there was ample evidence of contact between Reyes Garcia and Marquez, and I'd be happy to go through that ample evidence. If you cite Johnson and I think Audet for the principle that the reason for law enforcement focus on a defendant is not hearsay, was this Weathers' testimony about the reason for focus on defendant, or was it more just deep background, and are there cases indicating that that also is not hearsay? I think Wachamawa, I'm sorry, I don't know how to pronounce it, but we cited it in our brief. I think this court's decisions, and I think Johnson actually fairly stands for this proposition too, when, and I think by contrast, the decision Silva, the Seventh Circuit decision that they rely on, which says you can't get around Crawford, and it's clear you can't get around Crawford by just sort of narrating, and what do you do next in your investigation? But that's not what happened here. We have evidence that Reyes Garcia and an individual who was caught with six pounds of methamphetamine in a trap in his car in eastern Washington had 42 phone contacts before, right before that individual was caught. But I mean, counsel, I mean, the only, to me, I mean, 99% of the relevance of this would be the truth of the matter asserted, because it shows that the defendant is more likely guilty than not. I mean, this is substantive evidence in the fact that it may also furnish background for the investigation. I mean, that would be the cart driving the horse here. I mean, this is just substantive information that's coming in through just nothing more than hearsay. I think without it, without a tie, the jury would be left to wonder, wait a minute, we were talking about a seizure of six pounds of methamphetamine in eastern Washington. How did we get to western Washington? And so saying there are ties between these two individuals actually explains why the FBI started working with the DEA. But even if you think I'm wrong, and even if you think that this was hearsay that was let in in violation of Crawford, there was lots of evidence that this is harmless beyond a reasonable doubt, because there was lots of evidence of contacts between Reyes Garcia and Marquez that the jury heard that was not hearsay. They were, I can cite you six different places in the record which show that they were in regular contact. At SER 55 through 56, they're together at a restaurant in western Washington. At page 133, they're together at the house on Camino Island. At 162 through 63, they're together during the June 28th deal at the Extapa restaurant while they wait for the methamphetamine to come from Yakima in Contreras Ibarra's wife's car. I mean, wasn't part of the objected to hearsay, maybe I have this wrong, is that there was testimony that the DEA was suspicious of the defendant for drug trafficking? I think that's not part of the, I think the objected to testimony is that we received information that he was working with Eric Marquez and other individuals. Why were they investigating Marquez? We had a confidential source who could purchase drugs from him. And of course, then that confidential source testified at trial about purchasing drugs from Marquez. So to the extent it was, you know, we were investigating him, it was actually we were investigating Marquez, who was not one of the three defendants on trial. Yes, that's right. My question was wrong. Okay. Thank you. I can keep going through the evidence that ties Marquez and Reyes Garcia and shows that this is harmless beyond a reasonable doubt, but it is summarized in our brief. So I won't, unless the court would find it helpful. If there are further issues, I'm happy to address them. I think that the court's questions, the colloquy with regard to the counter surveillance. I do have one more question. Yes, Your Honor. It strikes me that the court in looking at 404B just simply assumed that the balancing that is required by the rule isn't necessary and that the court said, well, you know, the government has told me that a limiting instruction is enough and I don't really have to, and there's nothing in the record to indicate the court did this balancing. I mean, the record seems to me to indicate that the court assumed that there doesn't have to be this undue prejudice analysis because even if there could be prejudice, a limiting instruction is always enough. Is my reading of the record wrong? I think that if you're just looking at the — I think you're looking at when he ruled on Mr. Serrano-Correno's prior conduct, and he says, I think that the balancing that happens is in the discussion of why it's admissible, why it's helpful, and why it's not sort of unduly old. And I think that the critical issue there — I agree that he could have given a fuller description of that balance. I think he's also right that this court has repeatedly held that a limiting instruction is a way to deal with any potential prejudice. It is a potential way, but it certainly doesn't obviate the need for the balancing. Well, I think that's — I think that's right, but I think a court that says — the court is effectively saying, I know the law, and I have decided that the law that says that a limiting instruction is good enough applies here, is effectively what he's saying. This is an experienced district court judge, and he's gone through at some length with it gets in under 404B, and I think then saying — and the law says when a limiting instruction will help counter any potential prejudice, I should give one, and I will here — he's saying — I mean, he could have — again, he could have said it more fully, but this isn't a basis to reverse this conviction, because the court was well aware of the law that approves those instructions when it — when it made that statement. And of course, he was correct that the evidence should come in, because two of the charges against that particular defendant, Mr. Serrano-Correno, were that he possessed drugs with intent to distribute, and both of them resulted from incidents in which his house was searched pursuant to a search warrant. He was found to have drugs, and he was charged with intent to distribute. So the government had the burden of showing that he intended to distribute, and evidence that he had distributed previously was relevant to that. If the court has no further questions, we rest on our briefs, but I'm happy to address any of the other seven or eight issues. Apparently not.  Thank you, Your Honor. We ask that the judgment be affirmed. Okay. Thirty-one seconds, it says, I guess, here. Just one quick point on the question, Judge Bennett, that you asked about. The government says there's no prejudice here because there are lots of other contacts. The whole point of the defense, of course, was we didn't know what those contacts were about and arguing doubt to the jury. And then you have here an FBI agent saying, we received information that he was working with Mr. Marquez and his family. That is far more damning than just the contacts. And it's interesting, one of the points in the Binneman case that I mentioned in my supplemental authority letter, it says sometimes brevity is worse. And here's an example. Received information. That was like the FBI, for some jurors, God's word that they knew that my client was working with Marquez. So that is extremely damaging evidence and it's made more damaging by its brevity, I think. I'm over my time, unless the Court has questions. Your Honor, just very quickly, I'll just point out that the Sintub remedy was to return to the district court so they could find out if the jury was unbiased. And I think what we have here is a case where the threat was real to juror number three and it could have been expressed to other jurors. And once that happens, you must have the inquiry to find out if this jury can continue to be impartial. Concerning the propensity... I do have a quick question, I apologize. There are a lot of uncomfortable facets of jury service. When do we draw the line for the presumption of prejudice to attach? If we don't draw it at tampering or contact or indirect contact, where do we draw that line? Well, there is... It's the perception of the juror, correct? That's what you're looking at. She perceived a threat. She saw the three individuals. And certainly the Court recognized that, said, I know what the threat was to her. It was a threat to me. He didn't say it was a threat to me, but he was just like, I was alarmed or something to that. So that was sufficient to understand that that juror felt threatened by this information being given out, especially after all that happened in the previous day. Thank you. And then for the 403 balancing, no, there was never a record made of it. But here's a case where they're talking about bringing in four to five more prior bad acts and all that cumulative evidence. If there was a balancing test saying, well, maybe one would be allowed, but not all five. This was supposed to be a case of finding someone guilty based on the evidence presented against him here, not on his prior bad acts. Unless the Court has any further questions. Thank you, Your Honor. Okay. The case of United States v. Reyes-Garcia, Serrano-Correno, and Contreras-Ibarra is submitted. And the Court is now adjourned for this session.
judges: Ikuta, Benntet, Dorsey